The next matter on our calendar is Antonio McPherson v. Merrick Garland. Good morning, Counsel. Good morning, Your Honors. May it please the Court? My name is Afshan Khan. I represent the Appellant Petitioner in this matter, Antonio S. McPherson. Your Honors, my client presents two issues at hand to this Honorable Court. One, my client's denial of his claim for relief under the Convention Against Torture as a bisexual male, returning back to Jamaica, as well as his claim for derived citizenship under former 321A-3. In regard to his claim for relief under the Convention Against Torture, we believe that my client, based on the evidence that my client submitted, that the immigration judge, as well as the Board of Immigration Appeals, disregarded critical evidence that showed the flagrant violations against individuals who identify as LGBT, including my client. No one in the Council knows he's bisexual, except if he tells people. Yes, Your Honor, but the problem is with that, the concern with this is, Your Honor, as a child, which he did testify to during his hearing, he was identified as being bisexual, and individuals did target him. He was targeted violently through being a homophobe. He was 10 years old, you're saying? Yes, Your Honor, but he was 10 years old in his teens, he was. So it has to be the case that there's something in the record that would compel any reasonable fact finder to decide the opposite of what the agency decided, right? Do you really think that the record compels the conclusion that because he talked to somebody when he was 10 years old in Jamaica that those people necessarily would remember and are going to coordinate with the government to torture him when he returns to Jamaica? I do, Your Honor, and the record shows that we also submitted documentary evidence, testimony evidence from family members and family friends in Jamaica recently, in 2017-2018, showing that they know of my client, of the violence that he was subjected to, as well as the fact that if he were to return, he would be subjected to the same type of violence, also based on the fact that he does identify as a bisexual male. Violence when he was 10 years old was private violence, right? It was people who knew him who would harass him and so on, but torture has to be by the government. So what's the evidence that they're coordinating with the government? Well, Your Honor, again, as this court has specifically held in De La Rosa v. Holder, it stated that it can also be willful blindness or failure by the government to take action against certain actors. Yes, and there is evidence that Jamaica is not very favorable, or indeed is very unfavorable, to bisexuals and gays and it is against the law. But what evidence is there that the government goes along with private mistreatment in Jamaica? That's different from the general evidence that Jamaica makes certain kinds of behavior illegal. Sure, Your Honor. So, in regards to Jamaican law itself, it still has anti-buggery laws that does condemn homosexual actions between males. There are reports from Human Rights Watch, which had submitted as well as from the UK country condition report showing that government's failures investigate violent acts, assaults against LGBT individuals, as well as incidents in which they are reported. But the government, again, fails to take any actions to find the perpetrators, as well as prosecutors, private actors who've also tried to harm these individuals also. So, it's clear that these actions by private actors are being perpetuated or being still allowed or condoned willfully, blindly by the government in Jamaica, making it more difficult for someone such as my client to be able to live there and to live safely, and he is more likely than not to be tortured based on the fact that he is a bisexual male in Jamaica. Moving to my other argument of derived citizenship. My client claims derived citizenship through former INA 321A3. My client states that when he was born in Jamaica, he was born out of wedlock by his biological parents. At no point was my client ever, were the parents married or was the father ever acknowledged. But he's been adopted since then, right? Yes. Yes, he was. And so 321B says subsection A shall apply to an adopted child in certain circumstances. We'll talk about those circumstances in a second. But even if the circumstances applied to your client, shouldn't we read subsection A to apply to him treating his adoptive parents the way subsection A would otherwise treat biological parents? He has two adoptive parents, right? He's got a mother and a father. So it's very odd if 321B says you should apply subsection A to adopted child if the child is residing in the United States at the time of naturalization of the adoptive parents, then go back and apply subsection A to him as an adopted child and ignore the fact that he's been adopted and act as if he is still in the custody of his biological mother, who's his only mother, and that there is no father, when in fact he has two parents. And I understand this argument, Your Honor. But what we're saying that we also need to consider the fact that he's still considered illegitimate and that still was carried over. The fact that this status as an illegitimate child was never extinguished even after the subsequent adoption. So you're saying if in fact he had, let's say he met all the requirements for an adopted child. Let's say he was born illegitimate, but he has two adoptive parents, and he was residing in the United States at the time of naturalization, and both his parents were naturalized, so he otherwise would get citizenship under 321A1. You're saying because he was born illegitimate, he doesn't even get to take advantage of that. He still needs to be treated as illegitimate and go under the illegitimacy provision. So you're saying adoptive kids can never get citizenship through their adoptive parents, right? Because they're always treated as illegitimate if they were born illegitimate. What I'm saying is that under the Jamaican laws at the time, the Jamaica laws had eliminated the adult wedlock and wedlock distinctions in 1976. However, my client was born in 1975, which is one year after. So the law itself did not retroactively act, meaning that he did continue in this particular instance. Even if you're going to treat him as illegitimate, subsection A3 says naturalization of the mother if the child was born out of wedlock and the paternity of the child has not been established by legitimation. So you want to read that statute to mean when it says mother, it means adoptive mother. But when it says paternity, even though he has an adoptive father, you're saying we should ignore the adoptive father and say that the paternity of the biological father has not been established. So you're reading the statute to refer to the biological mother and ignore the adoptive. Sorry to refer to the adoptive mother and ignore the biological mother and refer to the biological father and ignore the adoptive father. You're like picking one parent from each relationship as if that's a whole. Right. That's how you want to read A3. No, I believe also there's also another argument that we had also prepared as well, that there is a violation of equal protection for my client under these laws, under the former I-321A. I believe that it is unfair the way the treatment is in regards to individuals who are illegitimate and adopted versus illegitimate children that are born to parents as well, biological children. So I believe in that respect there is a violation of my client's demand. I'm sorry. I'm sorry. What are the two classes where there's discrimination? The illegitimate adopted children versus illegitimate biological children under the INA. It's clear that the adopted children are... But as I was saying before, if you're illegitimate and adopted and you have two parents, the way you would read the statute is you treat the adoptive parents as the parents. So he wouldn't even be treated as illegitimate. Right. So if, in fact, subsection B says you apply it to an adopted child, and that means you treat the adoptive parents as his parents, then he's treated as if he has two parents because, in fact, he does. Right. He does, Your Honor. But at the same time, though, we also believe that the fact that he is illegitimate, that is something that is controlling also. His adoption was legal in Jamaica. It was the foreign law that was recognized. So if you were right that he retained his illegitimate status, that would be a benefit to him. Right. Because that means he could get citizenship only through the mother without having to worry about the naturalization of the father. But if he had two parents, then he would have to only get citizenship upon the naturalization of both parents. So it's actually to his advantage to have an illegitimate status. Right. So he's not really harmed by that. Well, Your Honor, the fact that he isn't a lawful resident, the fact that he would be, I mean, that does question his naturalization, whether or not he would be able to be here and be a U.S. citizen. That's the fact that he does have the ability in the country when his adoptive mother naturalized. We haven't even addressed that. That's subsection B. Right. So what about that? Yeah. So he doesn't get credit for naturalization. Well, so this is why we're arguing again with illegitimacy, that we are making the argument that illegitimacy is something that we want, believe that does carry over with the fact that the adoption itself was legal. It was something that was recognized by the United States, allowing his adoptive mother to petition for my client. Well, it's pretty, it's pretty contorted. It's admirable, but pretty contorted, I'm afraid. Thank you. Your time has expired, counsel, but you have reserved three minutes for rebuttal. We'll hear from the government. Good morning. May it please the court. My name is Arthur Rabin. I represent the government in this case. First of all, I want to apologize for not appearing by video. We're still working from home and I just moved to a new house in another state. So my Internet, unfortunately, is not working very well and I wasn't able to resolve the issue. But. Starting quickly off as to the issue of derivative citizenship, concerning petitioner statutory eligibility. I think the record is pretty clear in this case that he was not qualified for automatic citizenship under the former statute because you cannot read subsection B out of the statute. Counselor, let me tell you my problem, because of which I was the one who sent it from the NAC to the RAC. And that is smart, said that this was constitutional. The difference between adopted children and born children, because otherwise it made perfectly good sense. Somebody might come over here, become a citizen and then start to adopt people in the original country. And that way make any number of people eligible to come in. And that therefore the distinction, the requirement that somebody be a citizen, be in the country at the time the parent became citizen was certainly a rational one and had no problem. The difference between this case and smart is that in this case, she was adopted. He was adopted before the parent became a citizen. Well, in smart work was a requirement that both become the citizens. One of them adopted after and one adopted before. So my question is, is that difference between this case and smart enough to make a difference? No, your honor, because, you know, we just have to show that there's a rational basis review that there's the legitimate reasons for the government's put forward the interest that we put forward. There are rational relationship to the statute. And, you know, in smart, your honor, there was immigration fraud was just one prong of smart. The other interest was that, you know, the Congress could have wanted folks to show a real and abiding connection to the United States and to their children to adopt their parents. Why is that any different if a child was adopted before that? That is, why is it rational to distinguish between an adopted child and a born child? Given the tremendous policy of treating adopted and born in the same way, which is now pretty much a universal policy. Why should one make a difference when the adoption took place before the parent came to the United States? Well, your honor, so, you know, the interest here is that the government would like for people to have prior to coming here, real and abiding relationships with the children that are coming here. Once they get here, they're going to live here with them. If somebody already adopted them, why don't they have that relationship? I mean, the person, his mother was already in the United States. Yes, she had adopted him while he was in Jamaica, but she was already in the United States. They adopted him in Jamaica. That's correct, while they were in the United States. So why is that any less an abiding, a powerful relationship than if it was just ordinary born? Now, you know, I understand the notion, the very powerful notion that adoptions after are very different and could create any number of problems and that you don't have a statement of a family relationship. But my question went to that basic issue in that difference and whether that was treated adequately and smart, which is why I asked to have this be argued rather than be treated summarily. Yes, your honor. So, I mean, the adoption took place in 1987. In this case, September of 87, and then the mother became a naturalized citizen in 1989. But there's no evidence that he actually resided with adoptive parents because to become a citizen, she had to have resided in the United States for five years. I think we know that he wasn't residing with her when she became naturalized. I think Judge Calabrese's question is, you can understand why somebody becomes a citizen and then adopt somebody, it might be a problem. But does it make sense to distinguish between a parent who adopts a child in a foreign country and then comes to the United States, leaving the child at home and becomes naturalized? And somebody who adopts a child in a foreign country and moves to the United States with the child and becomes naturalized? I guess the question is, why is that a rational distinction for the statute to draw? Especially in a case like this, where he was actually living in Jamaica with his adopted father. So it wasn't even, you know, a question of him not being. Maybe there are reasons. I mean, maybe, you know, it might indicate he has a stronger tie to Jamaica and they didn't necessarily plan to return. I don't know. So maybe there is a reason. I don't think the suggestion is that there isn't one. I guess we're just curious about what the government's position is as to the rationale for that. Exactly. I'm not saying there isn't a reason. I'm just saying that smart, the reason given in smart didn't seem to me to be sufficient to cover this case. And so I'd like to hear your reason. Yeah, well, you're right. I mean. Just, you know, when somebody comes here and they reside here for five years in order to become a naturalized citizens, there's nothing to prevent them from going back to their own countries and fraudulently adopting somebody in order to extend those citizenship rights to another person. You know, and so the fraud concerns that were raised in smart perfectly extend to this case because the, you know, it's, you know, folks can obviously form those kind of immigration. That doesn't answer. I think Judge Menashe was making some suggestions that might answer. But saying that this person could go back and adopt after would say it is perfectly rational to apply that difference where the adoption occurs after, but it isn't rational to apply it to a case like this where it's before. You have to give us some reasons. And I don't say there aren't reasons why the difference is still rational. But let me put it this way. So if there is a Jamaican child, a Jamaican national child who has two Jamaican national parents and one of them goes to the United States and becomes naturalized, but the other stays in Jamaica, then I guess there's a question as to whether the naturalization should travel. And maybe it makes sense that you would think it important that the family decided to keep the child in Jamaica with the Jamaican national as opposed to moving to the United States. It does seem to indicate something about ties to the United States. Is that what you think that that's right? Is that something that Congress might have been thinking about? Of course. I mean, we're talking about immigrating to the United States, establishing links, real abiding links to this country. So going through adoption under a foreign country and their laws does not establish such a such links. I mean, we're talking about a real connection with this country. They're trying to get rights in this country. So why wouldn't Congress want to have concerns about that? And, you know, in this case, I take it that the father wasn't naturalized until much, much later. Right. Until after the McPherson attained majority. So it was a number of years after the mother did. So maybe it wasn't even clear that they intended to live in the United States in the long term at the time of the mother's naturalization. Correct. I mean, I don't know. I mean, the record is not clear on why the father took so long to come to the United States and then become a naturalized citizen. I think what I'm saying is that that kind of indicates the similar thing to what it might indicate that that even though the mother was in the United States and becoming naturalized, she did not live with the child. The child stayed in Jamaica. Maybe the child's in Jamaica with the father. Maybe they intended to live in Jamaica. And it was happenstance or a decision that was later made that they would come to the United States. Yeah, I, you know, I can only speculate. I mean, I can only go by what's in the record. I guess we're just asking. I mean, Judge Calabresi was just asking you to explain why the distinction made sense. So even if it's not about what's happening with this particular family in this particular case, I guess the question is, do those distinctions make sense for the statute to draw? Under a very easy test of a rational distinction. Right. And we believe that it does, because, again, we're trying to establish links to this country, a real abiding connection to the United States. And by having the father stay, you know, in their country and adopt him in their own country in Jamaica, does not establish such connections. And so just because, you know, it wasn't post facto adoption. But my question is, why does that distinction apply differently to adopted and born children? That is, you could have somebody who was born in Jamaica and was the born child of these two. And one of them came to the United States and became a citizen. And the other, the father, remained in Jamaica with the child. So the decision to be to the United States or to stay there is the same in both cases. Why is it different? Because one of them is an adopted child and the other one is not, because that's the distinction the law makes. And so I'm asking. So just to add to Judge Calabrese's question, I'm not sure that that's right. If you had a born child of two parents, wouldn't both of them need to be naturalized in the United States for citizenship to pass? You couldn't have only one parent go to the United States and be naturalized and pass citizenship. You would need both, I would think. So actually, you couldn't have that kind of differential treatment. Or could you? Maybe just answer Judge Calabrese's question. Yeah. So no, Your Honor. Under the former statute, under subsection A1, both parents have to naturalize. Otherwise, one of the parents have to be deceased. So your argument basically is that there isn't, in fact, the distinction that I'm worrying about between naturalized and not, because under section A, he would not have been able to become a derivative citizen on his terms if he were not an adopted child. That's correct, Your Honor, because his father naturalized long after he became of age. He aged out. Counsel, in the moment remaining, will you speak to the fears of this petitioner about being a bisexual male in Jamaica today? Yes, Your Honor. So just very quickly, substantial record evidence, which is the standard in this case, supports the agency's denial of conviction against torture protection. And that is because, first of all, he was not able to show that the experience, the mistreatment that he had as a child, the various harassment, discrimination that he testified about, just simply does not rise to the severe level of what's defined as torture. And secondly, substantial evidence also supports the determination that he failed to show that it's more likely than not that in the future he'll be tortured by a public official or with the acquiescence of a public official, because according to the 2016 Department of State report, the law, even though it prohibits, you know, a buggery, gross acts of indecency, it was not enforced in a consensual same-sex relationship between men, but it was only enforced in cases of sexual assault and child molestation. There's other evidence in the record showing that, you know, conditions are improving. There's gay pride parades and things like that. So to say that the evidence that he showed compels reversal, we don't believe it's fair, Your Honor. Thank you, counsel. Your time has expired. Ms. Khan, you reserve three minutes for rebuttal. Thank you, Your Honor. So just in response to the government's position in regards to the Convention Against Torture Denial. First, there's ample evidence also in the record that shows that my client would be more likely than not tortured should he return back to Jamaica based on his bisexual status as LGBT individuals are targeted more are more likely are targeted often. In 2017, the U.S. DOJ report basically states 53 incidents of physical assault and verbal assault against individuals were of LGBT status and in which the police failed to investigate. In 2017, the UK country report also shows, again, that the government in Jamaica fails to punish individuals, private actors who commit these types of acts of violence against LGBT individuals. And here the agency determined that under the fiercest particular circumstances, he was not likely to be tortured. So identifying individual incidents of harassment where the government didn't do anything wouldn't necessarily show that he and his circumstance, but it doesn't necessarily compel the conclusion that the agency was wrong because he himself is necessarily going to be tortured if he's returned. But by acknowledging the limited number of instances, not everybody is tortured. So what is the record evidence that shows that somebody in his particular circumstances is necessarily going to be tortured should he be returned to Jamaica? Well, Your Honor, again, we also submitted statements from family friends who are living in Jamaica currently who know of my client's sexual orientation and know individuals who are aware of his sexual orientation and that he would be targeted based on that. The fact that one of my client's family friend's testimonies when she had tried to get a notarized state refused to notarize it based on the content of it discussing his bisexuality clearly indicates this attitude, this homophobic, anti-homophobic attitude as well. And it's evident that also based on these reports that more likely than not, the government does fail to take any action to prevent or to protect individuals who are LGBT in Jamaica itself. And, of course, this court honorably decided both in Walker v. Lynch and Golding v. Garland, where the BIA and the immigration judge overlooked critical evidence such as these human rights violations and flagrant violations, as well as misapplied the government acquiescence standard also. So in this situation, we're sort of making the same argument that my client was not able to that my client would be subjected to more likely than not be tortured based on his bisexual sexual orientation. And then going to the derived citizenship claim, again, we still argue that based on his illegitimacy status, my client that did carry over after subsequent adoption as he was not eliminated and that he would still qualify as a derived citizen based on his adopted mother petitioning for him. Again, the United States recognized the legal adoption done in Jamaican foreign law and so forth. And so if it recognizes that, it would sense that it would also recognize the fact that my client would still be considered illegitimate despite the fact that he was adopted by his parents. Thank you, counsel. Thank you both for reserved decision on this interesting case.